Filed 2/19/15  P. v. Vandell CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060720 |
| v. | (Super.Ct.No. FSB1302955) |
| DAVID EDWIN VANDELL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Victor R. Stull, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Randall D. Einhorn and Martin E. Doyle, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant David Edwin Vandell of attempted first degree residential burglary (Pen. Code, §§ 664, 459).  After a bifurcated court trial

1

thereafter, the court found true an allegation defendant had suffered a prior strike conviction. The court sentenced defendant to six years imprisonment. On appeal, defendant contends defense counsel rendered constitutionally ineffective assistance of counsel. We affirm.

FACTUAL BACKGROUND

On July 11, 2013, at approximately 8:00 a.m., the victim was watching television in her home when she heard a rattling noise: "I originally thought it was an earthquake so I looked up at our chandelier-style lamp to see if that was shaking, which it was not, so I went over to the door because that was the area that it sounded like it was coming from." The victim walked to the front door: "When I went over to the door, the noise was getting louder and louder, I then put my hand on the door and I could feel the [wooden] door shaking." The shaking lasted 20 or 30 seconds.

The victim testified she "could also hear a slight clanking of a metal noise, it wasn't very loud but I could hear that as well, but I pushed back on the door and at that time it stopped." The man on her porch, whom the victim identified in court as defendant, neither knocked on the door nor rang her functional doorbell. The victim looked out the window where she "saw the defendant, his attire; I saw—he kind of had his back to me at first, then he turned around. I don't know if he saw me or not, but he then got really close to the window and looked in the window where I was." She "got a very clear look at his face." The victim never saw defendant touch the door.

After the victim saw defendant, she walked her son to his room where she shut him inside. She also grabbed a taser from out of her purse. The victim "was scared and

2

nervous." She looked out the window again and saw defendant leaving. Defendant was wearing "a black hooded sweater with a large iron cross on the back, and blue jeans."

The victim called the police. She had a wooden front door behind a mesh screened security door with a deadbolt on both sides and iron bars. Prior to that day, there was an approximately one-inch slit in the screen door; however, after defendant left, it was three to five inches wide. The victim "noticed it immediately once [she] opened the door after the defendant had left." Police told her they were unable to fingerprint the doorknob on the wooden door due to its surface texture.

The responding officer testified the victim's security screen door had a locking mechanism with a dual-keyed deadbolt requiring a key to open it both from the outside and inside. The victim told the officer "she observed [defendant] reach through the hole in the security screen door. Upon reaching through the hole, he had placed his hand on the door handle of the wooden door leading to the interior of the residence. She had stated that she had heard the push button lever on the door being activated and that the door was shaking violently back and forth as someone was trying to open it." The officer noticed damage to the security screen door consisting of a 12-inch hole from top to bottom and four to five inches wide, large enough for someone to reach their hand through.

The officer transported the victim to a location about two-tenths of a mile away where defendant was being detained. Defendant "was wearing a gray hooded sweatshirt with a black iron cross" and blue jeans, as the victim had described to the officer.

Another officer who arrested defendant testified defendant was wearing a gray sweatshirt with an iron cross and blue jeans. Defendant had nothing on him other than sunglasses and a hat; he had no burglary tools on his person.

Owen Daniels was the only defense witness. Defense counsel asked Daniels what he did for a living. The court asked defense counsel what relevance the question had. Defense counsel answered that Daniels "is a person that ministers to people, and my client was one of those people that came to him for help, and he gave him help, and that's how they came together. If you want me to, I can start off by asking him how he knows my client." Defense counsel then asked Daniels what he did for a living. Daniels responded, "I volunteer at a prison ministry in Norco. I do prison ministry. . . . It's— through that I've got it in over 40 prisons, 1,800 students throughout the prisons throughout the United States. My success rate for the people coming out of prisons and staying out of prisons is .10, and I've been doing it for probably eight, nine years now."

When asked how he met defendant, Daniels testified, "I met [defendant] by walking down the street, we ended up started talking. I was actually working in my front yard cutting trees down at . . . 17th Street. We got to talking. I can pretty much recognize people like that, I'm pretty good at that, and we got to talking about how long he's been out. He basically didn't have nowhere to go, so I asked him if he would like to go to work to make some money and in the meantime he can stay at my house."

Defendant stayed at Daniels's house for two to three weeks. Defendant worked for Daniels chopping down trees and doing "a lot of brush work." When asked by

4

defense counsel if defendant was doing any work on 18th Street, Daniels responded, "No, none at all." The victim's home was on 18th Street.

On cross-examination, when giving the success rate of his work with prisoners, Daniels testified, "This is just for my group of people out of Norco prison, California." Daniels also noted, "I work with pretty extensive parole people in prison, yeah." (*Sic.*)

DISCUSSION

Defendant contends his counsel rendered constitutionally ineffective assistance of counsel by eliciting from Daniels that defendant had been in prison; had little or no money, thereby giving him a motive for the attempted burglary; and that defendant was not doing any work on the victim's street. We disagree.

"""In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."""" [Citation.] [¶] Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [Citation.] Defendant's burden is difficult to carry on direct appeal, as we have observed: "'Reviewing courts will reverse convictions [on direct

5

appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.'" [Citation.]' [Citation.] If the record on appeal ""'sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected,"' and the 'claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.' [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 875-876.)

First, there is nothing in the record that affirmatively discloses counsel had no tactical purpose for her questions of Daniels. Indeed, establishing that defendant was at the victim's residence because he lived nearby and was looking for work would be an immediately obvious and vital evidentiary fact to establish as a defense. Defendant himself notes that his "actions were consistent with . . . knocking on doors looking for work . . . ." Daniels's testimony was the only evidence adduced at trial that would support this contention.

Nonetheless, defendant argues defense counsel must necessarily have not reasonably investigated Daniels due to the answers she received to her questions. However, this is not necessarily the case. Nothing in the record establishes whether defense counsel or her investigator had previously interviewed Daniels. If they had, it is distinctly possible Daniels told them defendant made his living doing yard work and had done work on 18th Street.

Moreover, even to the extent defense counsel wished to elicit evidence Daniels "ministers to people," and that defendant was one of those persons, as she explained to the judge in establishing the foundation for the testimony, this would not have necessitated Daniels's testimony that most or all of those persons to whom he ministered, including defendant, were former prisoners. Indeed, defense counsel could have expressly told Daniels not to mention that fact. However, one can never control what a witness will say on the stand regardless of whether one has prepared that witness beforehand. Likewise, the elicited fact that defendant had no money could have been a motive for his search for work, not just a motive for burglary.

Second, there was not a reasonable probability that but for Daniels's testimony, defendant would have been found not guilty. Here, defendant did not knock on the door or ring the functional door bell, which would have been the normal method of seeking to contact the residents for work. Rather, defendant shook the handle to the interior wooden door vigorously for 20 to 30 seconds such that the victim initially believed she was experiencing an earthquake. The victim told the responding officer she witnessed defendant reach through the mesh on the security door to grab the handle to the wood door. Defendant then looked through the window into the interior of the home.

Prior to defendant's actions, there was a small, one-inch tear in the screen mesh of the security door, which would not be wide enough to fit a hand through. However, after defendant left, it was discovered the tear had been widened to between three and five inches and 12 inches tall, large enough for someone to reach their hand through. Although the security door had keyed access on both sides, meaning even if defendant

7

had gained access through the mesh, he would have been unable to open the security door and, thereby, the wood door, without a key, it is likely defendant would not have known this until after he accessed the screen. Thus, this would explain why the victim testified she also heard "a slight clanking of a metal noise."

Finally, the victim testified she clearly observed defendant's face on the day at issue. She identified defendant in court as the perpetrator. The victim also gave police a description of defendant's attire consistent with what he wore when apprehended. Defendant was detained within two-tenths of a mile from the victim's home. Defendant acted in a manner consistent with someone who was attempting illegally to enter the victim's residence and entirely inconsistent with someone who was attempting to contact the residents for work. Therefore, there was no reasonable probability that the answers elicited from defense counsel's questions of Daniels were sufficient to undermine confidence in the verdict.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

KING
       Acting P. J.

MILLER
       J.

8